_____
                                        )
JOAQUIM DAROSA                          )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )    C.A. No. 16-485 WES
                                        )
ADMIRAL PACKAGING, INC.; and            )
ROBERT HUMMEL                           )
                                        )
        Defendants.                     )
_____)


## MEMORANDUM AND ORDER

After twenty-five years working as an ink-technician at Admiral Packaging, Inc. ("Admiral"), Plaintiff Joaquim Darosa was terminated in June of 2014 for losing his temper during a disagreement with a colleague. Although Darosa admits he lost his temper, he believes Admiral used the incident as a convenient excuse to fire him and that he was actually terminated because he suffers from ulcerative colitis, for which he took an extended leave of absence in 2013 under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.[1] See generally Compl., ECF No. 1-2.

_____

[1] The Court notes that ulcerative colitis qualifies as a "disability" under both state and federal law. See Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102(1); Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1, et seq.; Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 et seq.; see also Rhode Island Civil Rights of People with Disabilities Act, R.I. Gen. Laws § 42-87-1(1).

On August 4, 2016 Darosa filed a Complaint (ECF No. 1-2), alleging, _inter alia_, claims for FMLA retaliation (Count I) and disability discrimination (Count III) and seeking damages for his allegedly wrongful termination.[2] Admiral has rebutted these allegations by arguing that Darosa was a "problem employee" for years with an extensive disciplinary history and that the June incident was simply the straw that broke the camel's back. Defs.' Mot. for Summ. J. ("Defs.' Mot.") 1, ECF No. 19.

Before the Court is Defendants' Motion for Summary Judgment (ECF No. 19), to which Plaintiff has objected (ECF No. 24). For the following reasons, the Court grants in part and denies in part Defendants' Motion.

I.   Factual Background

Darosa worked as an ink technician at Admiral Packaging from 1989 until June 17, 2014. In 2006, he was diagnosed with ulcerative colitis, for which he took protected FMLA leave three times: first in 2006 (fifteen weeks), then in 2012 (fourteen days), and again 2013 (forty days).

---

[2] Darosa concedes that he cannot prevail on Count II (Whistleblower violation under R.I. Gen. Laws § 28-50-1) or as against Robert Hummel individually. _See_ Pl.'s Mem. in Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Mem.") 1, ECF No. 24-1 ("In this motion, Plaintiff concedes that he cannot meet his burden under R.I.G.L. § 28-50-1 nor against Hummel individually. Accordingly he proceeds against Admiral Packaging Inc, under FMLA retaliation and Disability Discrimination claims."). The Court therefore dismisses Count II and dismisses the Complaint with respect to Hummel.

A.   Darosa's 2013 FMLA Leave

In 2013, while Darosa was supposed to be out of work on FMLA leave, a video surfaced showing Darosa performing on stage at the Cape Verdean festival in Providence.  After seeing the video on YouTube.com and while he was still out on FMLA leave, Darosa's supervisors at Admiral called Darosa to ask why he was not at work, to offer him "light duty" work, and to invite him to the company picnic at McCoy Stadium. Pl.'s Statement of Undisputed Facts ("Pl.'s SUF") ¶¶ 29-30, ECF No. 24-2; Defs.' Statement of Undisputed Facts ("Defs.' SUF") ¶¶ 22-32, ECF No. 20.  Darosa claims that his performance at the festival made his supervisors "angry," though nothing in the record suggests that his supervisors discussed the matter with him when he returned to work or disciplined him for the apparent abuse of leave.  Pl.'s Mem. 12-13, 21; Defs.' SUF Ex. A ("Darosa Dep.") 15:18-25:4, ECF No. 20-1.

B.   Overtime Shifts at Admiral

Throughout his tenure at Admiral, Darosa worked first shift (7:00 a.m. to 3:00 p.m.) and was occasionally asked to work overtime by coming in early, around 4:00 a.m.  He testified that early shifts were hard for him because of his colitis and that he expressed this difficulty to his supervisors. Darosa Dep. 61:13-62:3. However, it is unclear whether he informed his supervisors that the reason these early shifts were hard for him was because

of his colitis, as opposed to the general difficulty of waking up early and arriving at work on time. Specifically, he testified as follows:

> Q: . . . [W]hy don't you tell me what you think a hostile work environment is?
>
> A: Well, if I have colitis and I go to the bathroom all the time, I have problems sleeping, and I'm losing weight, do you think I should be going to work 4:00 in the morning, 5:00 in the morning?
>
> Q: Okay. Did you ever ask your employer for a modified schedule?
>
> A: I asked many times. The fact that it would be hard, because one, I had to get my wife to get up to bring me, and I had to ask another employee to pick me up. And I had told them that it would be hard for me to make it in there on time. Since my schedule is from 7:00 to 3:00, 4:00 and 5:00 would be difficult. But I was never given that opportunity to stay home. It was more like a must.

Id. Darosa admits that he never asked to be scheduled for Admiral's second shift, which occurred in the afternoons, to avoid these early mornings. Id. 65:1-5.

C. Bonuses, Raises, and Performance Evaluations at Admiral

Admiral provides several kinds of monetary incentives to its employees, namely, a year-end bonus and an annual raise.[3] Both of

---

[3] Admiral also offers holiday bonuses to all employees employed on the day of the company holiday party and safety bonuses to all employees when Admiral finishes a quarter without a "lost time" incident. Defs.' SUF ¶¶ 40-43. Employees are automatically entitled to these bonuses, regardless of the quality of their

these are awarded based, in part, on the employee's annual performance evaluation. That evaluation is completed by a supervisor and rates the employee on a scale of 1 to 5 in the following categories: attendance, attitude, work ethic, work knowledge, productivity, assisting others, and overtime.

Of the three ink technicians employed at Admiral in 2013, Darosa received the lowest overall performance rating. His 2013 evaluation reads as follows:

> Darosa:  2 for attendance, 2 for attitude, 2 for work ethic, 5 for work knowledge, 3 for productivity, 2 for assisting others, and 2 for overtime.

Defs.' SUF Ex. G ("Disciplinary History") 60, ECF No. 20-7. Darosa's evaluation also included the comment "Not motivated/needs supervising." Id. In contrast, the other two ink technicians were rated as follows:

> Paul Amaral:   5 for attendance, 4 for attitude, 5 for work ethic, 5 for work knowledge, 4 for productivity, 3 for assisting others, and 4 for overtime; "very strong A Player."

> Joe Dionne:  3 for attendance, 4 for attitude, 3 for work ethic, 2 for work knowledge, 3 for productivity, 2 for assisting others, and 2 for overtime; "Still new and learning."

Id.

---

workplace performance and Darosa does not claim he was refused either award.

Based partly on these performance ratings, in 2013, Darosa received a 3% annual raise and a $500 year-end bonus; Paul Amaral, in contrast, received a 5% annual raise and, allegedly, a larger year-end bonus. Pl.'s SUF ¶¶ 4, 8, 21-24. However, Darosa does not quantify how much larger or submit any evidence showing that Amaral's bonus was, in fact, larger than his own. Id. Darosa also alleges that Admiral's owner, Harlan Frank, personally handed him his bonus check for 2013 and told him that the reason he received a lower year-end bonus for 2013 was because he "didn't work the whole calendar year." Pl.'s SUF ¶ 27; Darosa Dep. 24:17-23. Darosa contends that there is a connection between the size of his 2013 year-end bonus and the amount of FMLA leave he took. He argues that he received a $1,350 year-end bonus in 2012 when he took only fourteen days of FMLA leave while he received a $500 bonus in 2007 and 2013, when he took fifteen weeks and forty days of FMLA leave, respectively. Id. ¶¶ 21-23. However, Darosa has not submitted any evidence showing his bonus and raise history for the other twenty-two years of his employment at Admiral.

Darosa also points to several comments made by his direct supervisor, Robert Hummel, to prove that there is a connection between his 2013 FMLA leave and his lower year-end bonus and annual raise. Specifically, he alleges that, after he returned from FMLA leave in July of 2013, Hummel told him that he had been hired "to clean house" and "get rid of the . . . bad apples." Darosa Dep.

42:1-15; 45:5-22.  However, Darosa admitted that Hummel made the same comment to everyone at Admiral and that he and his co-workers "kind of joked" about how "the new manager's here to clean the house." Id. 44:12-22.  Additionally, Hummel allegedly told him at some point that he was there to get rid of "the old, the sick, the people taking a lot of time out from work," which Darosa understood as referring to his ulcerative colitis and related FMLA leave. Id. 45:5-22.

D.  Darosa's Disciplinary History at Admiral

Darosa's disciplinary history at Admiral reflects chronic absenteeism and tardiness as well as aggressive, insubordinate, and inappropriate conduct. See generally Disciplinary History. However, the last written report documenting Darosa's misconduct was dated October 2009.  See Disciplinary History at 58.  John Wilbur, Admiral's Vice President and CFO, testified that Darosa historically had attitude and attendance problems and that Darosa's supervisors generally spoke directly to him when these issues arose and did not always make a formal record of their discussions.  Defs.' SUF Ex. C ("Wilbur Dep.") 11:21-12:3; 42:11-44:10. Likewise, Admiral's owner, Harlan Frank, testified that many of Darosa's interim supervisors had previously reported Darosa's attitude as a problem.  Defs.' SUF Ex. E ("Frank Dep.") 31:2-32:9, ECF No. 20-5.

E.    Termination Incident

On June 17, 2014, Darosa was instructed by a press operator, Walter Beauchamp, to stop mixing and toning inks until the client arrived to approve the color on a sample sheet. Pl.'s SUF ¶¶ 41-45; Defs.' SUF ¶ 129. According to Admiral, Darosa disobeyed that instruction, yelled at Beauchamp to "let me do my job!" and continued mixing and toning the inks anyway; the ink was ultimately wasted, at great cost to Admiral, when the client later rejected the sample. Defs.' SUF ¶¶ 127-137. Beauchamp stated that he reported the incident up the chain of command the same day and that Darosa was fired a week later, on June 25. Defs.' SUF ¶¶ 138-148. Darosa's version of events differs slightly: he admits that he yelled at the press operator to "let me do my job!" but contends that disagreements of this sort were common and that he did not continue to mix or tone inks after he was instructed to stop. Pl.'s SUF ¶¶ 49-54. He also alleges that Admiral is lying about the ink being wasted because he did not personally see anyone discard the ink after the customer rejected the sample. Id. ¶ 55.

II. Legal Standard

Both Darosa's FMLA retaliation claim and his ADA discrimination claim are analyzed under the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). Under that paradigm, Darosa bears the initial burden of establishing a prima facie case. See id.

Establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee, which can be rebutted only if the employer articulates a legitimate, nondiscriminatory reason for its actions. Id.; see also Oliver v. Dig. Equip., 846 F.2d 103, 108 (1st Cir. 1988).  If Admiral meets this burden, then Darosa has the opportunity to demonstrate that the proffered reason was not the true reason for termination but was merely a pretext for retaliation and discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). However, even where an employer has a "compelling reason" for terminating an employee that is "wholly unrelated" to that employee's disabilities, the employer cannot "use the occasion as a convenient opportunity to get rid of [a] disabled worker[]." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998) (citing Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1195 (7th Cir. 1997)).  "Nor can it be an opportunity to get rid of workers who exercise their FMLA right to take medical leave for serious medical conditions." Id. (citing 29 U.S.C. § 2615(a)).

Summary judgment is appropriate when, taking all inferences in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c);

Hodgens, 144 F.3d at 158. "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quotations omitted).

III. Discussion

    A.    Count I – FMLA Retaliation

    Darosa first alleges that he was terminated in retaliation for taking forty days of FMLA leave in 2013. To make out a prima facie case of FMLA retaliation, Darosa must show that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the protected activity and the adverse employment action. See Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).

        i. Darosa's prima facie case

    There is no dispute here that by taking FMLA leave, Darosa "availed himself of a protected right" under the FMLA or that he was adversely affected by Admiral's decision to terminate him. Randlett, 118 F.3d at 862. However, the parties disagree about whether Darosa's $500 year-end bonus and 3% annual raise in 2013 constitute adverse employment decisions and whether Darosa has

established a causal connection between his FMLA leave in 2013 and his ultimate termination a year later.

> 1. Darosa's 2013 year-end bonus and annual raise do not constitute adverse employment decisions under the FMLA

Darosa alleges that he suffered an adverse employment decision when he received a lower year-end bonus and annual raise for 2013 as compared with 2012.  See Pl.'s Mem. 10.  While he acknowledges that the bonus and raise at issue were awarded, in part, based on his poor performance evaluation in 2013, he contends that his supervisors impermissibly lowered his score in the "attendance" and "overtime" categories because he took so much FMLA leave that year. Id. at 13-15.  He apparently believes that his low scores in those two categories (as opposed to his low scores in virtually every other category) caused him to receive a reduced bonus and raise.

As an initial matter, Darosa has produced no evidence showing that his supervisors actually considered his FMLA leave when evaluating his performance: Admiral has no official policy about how supervisors should fill out the evaluation form, the form itself contains no instructions about what supervisors should consider, and Wilbur testified that none of Admirals' supervisors considered FMLA leave when evaluating an employee. See Wilbur Dep. 29:19-31:21; Frank Dep. 25:5-26:11. However, even if Darosa had proved that his supervisors considered his FMLA leave when

11

evaluating his performance, his lower bonus and raise in 2013 still would not constitute an adverse employment decision in violation of the FMLA because: (1) the awards were based on specific goals which Darosa failed to meet, as evidenced by his low scores in five of the six evaluation categories; and (2) both awards were discretionary, incentive-based awards to which Darosa was not automatically entitled. See Wilbur Dep. 33:10-14 ("Most of our bonuses each year are very subjective. After company profitability, most of it comes down to really the owner and a meeting one on one with the supervisor and how they performed during the year.").

When a bonus or raise is based on a specific goal – such as hours worked or perfect attendance – an employee who failed to meet that goal due to FMLA leave may properly be denied payment. See 29 C.F.R. § 825.215(c)(2) ("[I]f a bonus or other payment is based on the achievement of a specified goal such as hours worked, products sold or perfect attendance, and the employee has not met the goal due to FMLA leave, then the payment may be denied, unless otherwise paid to employees on an equivalent leave status for a reason that does not qualify as FMLA leave. For example, if an employee who used paid vacation leave for a non-FMLA purpose would receive the payment, then the employee who used paid vacation leave for an FMLA-protected purpose also must receive the payment."). Additionally, when there is no automatic entitlement to the bonus

or raise, denial of that award does not constitute an adverse employment action. See Rabinovitz v. Pena, 89 F.3d 482, 488–89 (7th Cir. 1996) ("[L]oss of a bonus is not an adverse employment action in a case such as this where the employee is not automatically entitled to the bonus.").

Here, Admiral employees were scored on their ability to meet specific company goals: attendance, attitude, work ethic, work knowledge, productivity, assisting others, and overtime. When compared with his fellow ink technicians, it is clear that Darosa failed to meet most of these goals, as evidenced by the fact that he scored lower in almost every category than his colleagues. Because Darosa has produced no evidence showing that Admiral gave lower scores (and, consequently, lower bonuses and raises) only to FMLA-leave taking employees but not to employees who took non-FMLA leave, Darosa has not established that his year-end bonus or annual raise were reduced in retaliation for his taking FMLA leave in 2013. See 29 C.F.R. § 825.215(c)(2) ("[I]f an employee who used paid vacation leave for a non-FMLA purpose would receive the payment, then the employee who used paid vacation leave for an FMLA-protected purpose also must receive the payment.")

Likewise, because both the year-end bonus and the annual raise were discretionary, incentive-based awards to which no Admiral employee was automatically entitled, Darosa did not suffer an adverse employment action by receiving reduced awards. See Frank

Dep. 24:14-18 ("Jack's attendance rating is based on Jack's performance while he was at work. Jack was notorious for coming in late, leaving early. He's rated against his peers for the time that he's on the job only."); Wilbur Dep. 33:10-14 ("Most of our bonuses each year are very subjective."). The analysis might be different had Admiral denied Darosa the safety or holiday bonuses (see supra note 3) to which all employees were automatically entitled, regardless of the quality of their performance. However, Darosa does not dispute the fact that he received those bonuses on the same terms as every eligible Admiral employee. Accordingly, Darosa's $500 year-end bonus and 3% annual raise do not constitute adverse employment decisions under the FMLA.

### 2. Causation

The parties dispute whether Darosa has established a causal connection between his 2013 FMLA leave and his ultimate termination almost a year later. Admiral Argues that Darosa's FMLA leave is too attenuated from the termination decision to be related. Darosa contends, in essence, that the temporal nexus is irrelevant because several comments from Hummel and Frank indicate that Admiral was "setting him up for something" – i.e., his ultimate termination. Darosa Dep. 46:10-11.

Darosa's strongest evidence showing a causal connection between his termination and his FMLA Leave is a comment Hummel allegedly made in February 2014, when he told Darosa that he was

there to get rid of "the old, the sick, the people taking a lot of time out from work." Id. 45:5-22. It is unclear where and when Hummel made these comments, but Darosa testified that he could tell from Hummel's "tone" that Hummel was referring specifically to him and his disability. Id. 45:23-46:19. At around the same time, Hummel also allegedly told Darosa that "soon he would not have to worry about" certain internal processes to which Darosa had objected. Id. Darosa believes that these two comments, taken together, indicated that Hummel was "setting [him] up for something" and implies (without stating outright) that the "something" was his ultimate termination several months later. Id. 46:10-11.

On the one hand, there appears to be no real connection between the "old and sick" comment and the comment that "soon [Darosa] would not have to worry about" certain processes, because Darosa testified that the two comments did not occur in the same conversation and may have even occurred as far as a month apart. Id. 45:13-46:24. On the other hand, Hummel's comment about "sick" employees who were "taking a lot of time out from work" certainly could be a reference to disabled employees taking medically-necessary leave. Moreover, because Darosa's termination occurred less than six months after this comment was allegedly made, there is a (very tenuous) temporal connection between the comment and the termination. Although it is a close call, taking all of the

evidence in the light most favorable to Darosa, Hummel's comment about getting rid of "the old, the sick, the people taking a lot of time out from work" employees is sufficient to establish a causal connection between his 2013 FMLA leave and his termination in 2014. Id. 45:5-22.

ii. Pretext

As Darosa has established a prima facie case of FMLA retaliation, Admiral may rebut the presumption of discrimination only by articulating a legitimate, nondiscriminatory reason for its termination decision. See Oliver, 846 F.2d at 108. If Admiral meets this burden, then Darosa can defeat summary judgment only by demonstrating that the proffered reason was not the true reason for his termination but was merely a pretext for FMLA retaliation. Burdine, 450 U.S. at 256.

Admiral has met its burden by contending that Darosa was fired in response to the June 17 incident, which Frank described as "a really bad situation of insubordination . . . where he cost us a lot of money and where the customer was not satisfied." Frank Dep. 31:9-13. However, even though Admiral had a "compelling reason" for terminating Darosa that was "wholly unrelated" to his colitis and accompanying FMLA leave, it cannot "use the occasion as a convenient opportunity to get rid of [a] disabled worker[]." Hodgens, 144 F.3d at 167 (citing Matthews, 128 F.3d at 1195). Nor can it be an opportunity to get rid of workers who exercise their

FMLA right to take medical leave for serious medical conditions."
Id. (citing 29 U.S.C. § 2615(a)).

Admiral argues that Darosa's history of workplace misconduct supports the legitimacy of its termination decision because it proves that Darosa was a problem employee who had finally run out of goodwill.  Indeed, the record reflects that Darosa had an extensive history of disciplinary issues and attitude problems while employed at Admiral.  He was suspended for three days in March 1993 after an aggressive confrontation with multiple supervisors and colleagues over a can of spilt ink.  See Defs.' SUF ¶ 97; see also Disciplinary History at 6-10.  Later that same year, he received a verbal warning for being late nineteen times and absent six times between January and July.  Id. ¶ 98, Ex. G at 13.  Similarly, on April 1, 1996, after months of chronic tardiness and absenteeism, Darosa received a "First and Final warning" after he "[c]reated a disturbance involving union and management employees on 3/29/96," pursuant to which he was informed that the "[n]ext incident will result in discharge." Id. ¶ 100, Ex. G at 16.  For years thereafter, Darosa's attendance problems plagued his employment at Admiral and he was written up many other times for chronic tardiness and unexplained absenteeism, as well as violations of safety protocols for stunts like riding an ink cart down a ramp.  See generally Disciplinary History.  Given this track-record, Admiral contends that Darosa's insubordinate,

aggressive behavior on June 17, 2014 was simply "the last straw." Frank Dep. 31:12-14.

However, the severity and consequences of the June 17 disagreement are hotly disputed issues of fact: Admiral maintains that Darosa screamed at another employee and refused to follow directions, causing Admiral to waste a significant amount of ink, at great cost; Darosa admits that he lost his temper, but denies that he refused to follow instructions and argues that the ink was not, in fact, wasted. The Court must take these disputed facts in the light most favorable to Darosa. Viewed through that lens, it is arguably not credible that a minor disagreement between employees should suddenly constitute a fireable offense when, prior to 2014, much more egregious conduct had warranted only a handful of written warnings or, at worst, a suspension. Stated differently, by not firing Darosa for his more egregious conduct early on, Admiral evidenced its belief that Darosa's usefulness as an ink technician outweighed his disciplinary issues; the company's calculus appears to have changed, but only <u>after</u> Darosa took forty days of FMLA leave in 2013.

The FMLA does not permit employers to rid themselves of individuals who are "taking a lot of time out of work," Darosa Dep. 45:17, by biding their time until the leave-taking employee commits a minor, if legitimate, infraction. Courts cannot allow these garden-variety human errors to sanitize an employer's

discriminatory employment decision because doing so would defeat the core purpose of the FMLA: "[T]o help working men and women balance the conflicting demands of work and personal life [by] recognizing that there will be times in a person's life when that person is incapable of performing her duties for medical reasons." Hodgens, 144 F.3d at 159 (quoting Price v. City of Fort Wayne, 177 F.3d 1022, 1024 (7th Cir. 1997). By the same token, as has been so often repeated, an employer is free to terminate an employee for a good reason or a bad reason – just not an illegal reason. Here, the jury will have to decide which it is.

Because the parties dispute the specifics of the June 17, 2014 incident, the Court finds that Darosa has established a colorable argument that Admiral used the June 17, 2014 incident as a "convenient opportunity to get rid of [a] disabled worker[]." Hodgens, 144 F.3d at 167. Accordingly, there is a genuine dispute of material fact as to whether Admiral's proffered reason for terminating him was merely a pretext for FMLA retaliation.

B.   Count III – ADA Discrimination, Hostile Work Environment

Darosa points to approximately a dozen harassing comments he received after he returned from his 2013 FMLA leave to support his allegation that he was subjected to a hostile work environment based on his disability.  See Compl. ¶¶ 30-34.  Those comments include the following: three or four comments from a maintenance worker that the restroom "stinks" and that Darosa "shit like a

bird," Darosa Dep. 36:11-20; three to five comments from a press operator to the effect of "I know your kind," "I know your people," and "you stink," Id. 38:6-25; and occasional comments from Beauchamp about Darosa's frequent trips to the restroom. Id. 39:22-40:9. Darosa claims that he did not report these comments because his supervisor at the time was present when the comments were made and never intervened. Id. 39:4-14.

To prevail on a hostile work environment claim premised on his disability, Darosa must show that: he was disabled; he was subject to uninvited harassment; Admiral's conduct was based on his disability; the conduct was so severe or pervasive that it altered the conditions of his work environment; and the harassment was objectively and subjectively offensive. See McDonough v. Donahoe, 673 F.3d 41, 45 (1st Cir. 2012).

There is no dispute that Darosa suffered from a qualifying disability under the ADA or that the aforementioned comments were directed at him and were based on his disability. However, Darosa admits that these comments occurred only a handful of times, indicating that, by definition, the alleged harassment does not constitute "severe and pervasive" conduct sufficient to establish a prima facie case of hostile work environment. See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (observing that "sporadic use of abusive language, gender-related jokes, and occasional teasing" do not suffice to show a hostile work

environment); <u>Kosereis v. Rhode Island</u>, 331 F.3d 207, 216 (1st Cir. 2003) ("A hostile work environment generally is not created by a mere offensive utterance, nor does it arise from simple teasing, offhand comments, and isolated incidents.") (citations and quotations omitted); <u>Morgan v. Massachusetts General Hosp.</u>, 901 F.2d 186, 192 (1st Cir. 1990) (holding that conduct rises to the level of actionable harassment only when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment") (citations and quotations omitted). Accordingly, Admiral is entitled to judgment as a matter of law on Count III.

IV. Conclusion

For the aforementioned reasons, Defendants' Motion for Summary Judgment (ECF No. 19) is DENIED as to Count I and GRANTED as to Count III. Additionally, the Court dismisses Count II.


IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date: May 2, 2019